238 S.W.2d 945 (1951)
MISSOURI PAC. R. CO. et al.
v.
UNITED BRICK & CLAY WORKERS UNION, LOCAL NO. 602, et al.
No. 4-9406.
Supreme Court of Arkansas.
April 9, 1951.
Dissenting Opinion April 23, 1951.
Rehearing Denied May 21, 1951.
Richard M. Ryan, Hot Springs, W. J. Smith, William H. Donham and Henry Donham, all of Little Rock, for appellants.
Mullinax, Wells & Ball and Charles J. Morris, all of Dallas, Tex, Edwin Cash, Malvern, for appellees.
GEORGE ROSE SMITH, Justice.
This suit arises from a strike which is taking place at the Acme Brick Company's plant near Malvern. There are two means of access to the Acme plant, one by a public road leading to the company's gates and the other by a spur track from the appellant's main line. The striking employees, members of the appellee labor union, established picket lines at the highway gates and also at a point about a quarter of a mile from the plant where the *946 main line crosses a public highway. The railroad company brought this suit to enjoin the union from maintaining the latter picket line. At the conclusion of the plaintiff's proof the chancellor sustained the union's motion to dismiss the complaint for want of equity.
The chancellor, in passing upon the motion to dismiss, was required to view the evidence in the light most favorable to the plaintiff, Werbe v. Holt, 217 Ark. ___, 229 S.W.2d 225, and we follow the same rule upon appeal. So considered, the testimony shows that Acme's employees went on strike in May, 1950. Acme employed other workmen and continued to operate its plant in spite of the strike. The picket line now complained of was established by the union at a point as close to the Acme plant as the strikers could occupy without trespassing on property of Acme or of the railroad.
The proof makes it plain that the pickets' purpose is to convey their message to trainmen who are on their way to the Acme plant. During most of the day the pickets sit idle, paying no attention to passing motorists or to the appellant's through trains. But when a switch engine destined for the Acme plant comes in view the pickets stand on the highway and display their signs. The railroad's regular crews invariably refuse to drive across the picket line. Hence the railroad company has been sending supervisory employees from Little Rock on each trip to the Acme plant. When the picket line is reached the regular crew stop the train and alight, and the supervisory employees take charge and run the train into the plant to pick up loaded cars or to leave empty ones.. The regular crews resume control when the train repasses the picket line. This system has been so inconvenient to the railroad company that it sends trains only twice a week instead of daily, as it used to do.
In its argument the appellant concedes the union's right to maintain a peaceful picket line for a lawful purpose. This case differs from the average only in that the pickets patrol an isolated railroad crossing instead of a sidewalk used by the general public. But the railroad track is a means of access to the Acme plant, and we think it immaterial that the railroad company alone habitually uses this entrance. It is easy to imagine a sawmill situated in a forest, accessible only by rail. Unless pickets could present their message to persons arriving by train such a mill would be immune from the usual means of advertising the existence of a strike.
The appellant, to distinguish this case from ordinary sidewalk picketing, insists that this picket line is maintained for an unlawful purpose and therefore may be enjoined under the doctrine of Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S. Ct. 684, 93 L.Ed. 834, and similar decisions. In an effort to show that the appellee's purpose is illegal the appellant presents a threefold argument.
First, it is said that the picketing prevents the railroad from complying with its duty to provide equal and nondiscriminatory service to all shippers. Ark.Const, art. 17, §§ 3 and 6. This argument is unsound. It is at least questionable whether a railroad is required to provide service when impeded by a strike beyond its control. See Gage v. Ark. Central R. Co, 160 Ark. 402, 254 S.W. 665. But a more clearcut answer to this contention is that the purpose of the picketing is not to prevent the carrier from performing its duties; that is merely an incidental result. And that result comes about only because the railroad's own employees, over whom it presumably has control, are refusing to cross the picket line. Carried to its logical end the appellant's argument would outlaw all picketing, since it could always be shown that some employee of a motor carrier or other public utility had refused to enter the strike-bound premises.
Second, we have an 1868 statute making it a misdemeanor for any person to do any willful act whereby a railway engine is stopped or obstructed. Ark.Stats. 1947, § 73-1105. Construing this penal statute strictly, we think it inapplicable to the present case. The statute is manifestly aimed at physical obstructions or other conduct endangering lives or property; *947 indeed, it gives the railroad treble damages for ensuing injuries to its property. Under a like statute it has been held not an offense for a passenger wrongfully to pull an emergency signal-cord, causing the engineer to stop the train. Commonwealth v. Killian, 109 Mass. 345, 12 Am. Rep. 714. There it was said: "This evidence fails to prove a criminal obstruction of the train, within the reasonable meaning of the statute. The law was not intended to apply to a case where the train is stopped by an engineer, or other person having control, in consequence of a false signal communicated in this manner by a passenger. If the terms of the statute do not imply an actual physical obstruction, they at least require something more than the use of the agencies here employed." We agree with the Massachusetts court and think it rather far-fetched to suppose that by this law the General Assembly intended in 1868 to establish a policy making a picket line unlawful simply because sympathetic railway employees prefer not to cross it.
Third, it is contended that since the appellant alone is hampered by the picket line it amounts to a secondary boycott and is therefore unlawful. See 29 U.S.C.A. § 158(b), and Boyd v. Dodge, Chancellor, Ark, 234 S.W.2d 204. If we assume, without deciding, that a secondary boycott is unlawful in Arkansas, we find no such boycott in the appellee's conduct. The picket line is maintained as close to Acme's plant as is possible without a trespass. As we have already seen, the fact that the appellant alone is affected is immaterial. Like most picket lines this one has among its purposes that of discouraging outsiders from doing business with the strikers' former employer. In its present location the picketing is primary and not secondary.
As to the federal law, the exact point was decided adversely to the appellant in Ryan Construction Corp, 85 NLRB, No. 76. There the strikers picketed the entire premises, including a gate which had been cut in the fence for the exclusive use of a construction company which was working on a project for the strike-bound employer. The employees of the construction company refused to cross the picket line at their special gate. The Board held that the picketing, even though it affected only the construction company, was primary and therefore not an unfair labor practice under the cited section of the Taft-Hartley Law. So here, the appellee is picketing both entrances to the Acme plant, and the strike is not directed against the appellant merely because it is the only visitor using this particular entrance. Affirmed.
HOLT and McFADDIN, JJ, dissent.
McFADDIN, Justice (dissenting).
The Railroad Company is the innocent third party to the labor dispute between (a) Acme Brick Company and (b) its employees : yet the majority opinion is allowing the innocent third party to be injured by those engaged in the quarrel. It is conceded by all parties that since the decision of the United States Supreme Court in Giboney v. Empire Storage & Ice Co,[1] an injunction should be granted against any picketing which causes a violation of the State law. I am strongly of the opinion that the pickets, in the case at bar, are violating Sec. 73-1105, Ark.Stats, and therefore the injunction should be granted.
The majority opinion in one paragraph brushes aside our said Statute. The paragraph begins: "Second, we have an 1868 statute making it a misdemeanor for any person to do any willful act whereby a railway engine is stopped or obstructed. Ark. Stats. 1947, § 73-1105. Construing this penal statute strictly, we think it inapplicable to the present case. The statute is manifestly aimed at physical obstructions or other conduct endangering lives or property; indeed, it gives the railroad treble damages for ensuing injuries to its property."
And the same paragraph in the majority opinion ends with the sentence: "We
*948 * * * think it rather far-fetched to suppose that by this law the General Assembly intended in 1868 to establish a policy making a picket line unlawful simply because sympathetic railway employees prefer not to cross it."
I think a more thorough consideration of Sec. 73-1105, Ark.Stats, leads to a conclusion entirely different from that reached by the majority. Act 71 of the Arkansas Legislature of 1868 is entitled "An Act to Provide for a General System of Railroad Incorporation". This was, and is, a comprehensive Act of 45 Sections covering such matters as the number of stockholders; meetings of stockholders; duty of railroad companies to construct lines; and also the general powers, liabilities and restrictions of railroad companies. Most of the Sections of this Act 71 are still the law in Arkansas, as found in Sec. 73-301 et seq., Ark. Stats.[2] Section 37 of Act 71 of 1868 is now Sec. 73-1105, Ark.Stats., and the germane portion reads: "If any person shall wilfully do, or cause to be done, any act whatever, whereby any * * * engine * * * shall be stopped * * * the person or persons so offending shall be guilty of a misdemeanor * * *."
It is definitely shown that the deliberate picketing in the case at bar has caused the engine to be stopped: and such is the offense at which Sec. 73-1105 is aimed, regardless of the date of the legislative enactment. Undoubtedly this Section 37 of the Act of 1868 came to us from the English Statute, 24th and 25th Victoria, Chapter 97, Section 36, adopted by the English Parliament in 1861, which reads: "Whosoever, by any unlawful Act, or by any wilful Omission or Neglect, shall obstruct or cause to be obstructed any Engine or Carriage using any Railway * * * shall be guilty of a Misdemeanor, * * *."
Here are two cases decided by the English Courts under the said Statute:
(1)In the case of Regina v. Hadfield, decided June 4, 1870 (Vol. 1, Crown Cases Reserved, P. 252), the facts were that the accused had changed some railway signals at a station. The change caused a train, which would have passed the station without stopping, to slacken speed and to come to almost a complete stop. It was held that the accused had obstructed a train within the meaning of the Statute. One of the Judges said "there was as much an obstruction as if a log of wood had been placed across the rails".
(2)In the case of The Queen v. Hardy, decided January 21, 1871 (Vol. 1, Crown Cases Reserved P. 277), there was a prosecution under the same Statute. The accused, who was not an employee of the railroad company, stood on the right-ofway between two lines of rails; and as the train was approaching he held up his hands in the manner used by inspectors of the line when desirous of stopping a train. Such act by the accused caused the train to stop, just as the accused had planned. The Court held that the accused was guilty of obstructing a train within the meaning of the Statute.
The similarity of our Statute and the English Statute makes the English cases full authority for the interpretation that I am giving to the Arkansas Statute. The English case said that holding up of hands if designed to stop the trainconstituted an obstruction. In the case at bar the strikers, by holding up the picket sign, caused the engine to stop. The English Courts held fhat any stopping of the train was a violation of the Statute. I submit the same rule should apply here, since our Statute is not a safety statute but is one to guarantee the continuous operation of trains.
In this connection, it is also well to note the Federal Statute on obstructing the mail. It is U.S.C.A., Title 18, new section 1701; and it reads: "Whoever knowingly and willfully obstructs or retards the passage of the mail * * * shall be fined not more than $100 or imprisoned not more than six months, or both."
In United States v. Thomas, D.C, 55 F. 380, some boys placed an obstruction on the track of an electric railway, whereon the *949 mails were being carried; by so doing, the boys delayed the mail. They were held guilty of the crime of obstructing the mail. A recent case involving the same Federal Statute is United States v. Anderson, 7 Cir, 101 F.2d 325, certiorari denied by U. S. Supreme Court, 307 U.S. 625, 59 S.Ct. 822-826, 83 L.Ed. 1502-1509. In that case some coal miners in Illinois, in furtherance of their strike, blasted the railroad and thereby delayed the mail. The Court held that the strikers had the Statute and they were given sentences.[3]
The majority cites Commonwealth v. Killian, 109 Mass. 345, 12 Am.Rep. 714, wherein the Massachusetts Court decided a case in March 1872 under a statute in which the prohibited act affected the safety of the passengers*[4] In the Massachusetts case the defendant, while a passenger on the train, pulled the signal cord which caused the engineer to stop the train. It was not shown whether the defendant did the act willfully and maliciously, or because he ac tually thought that the train should be stopped. The Massachusetts Court said that, regardless of his motive, the pulling of the bell cord was not within the purview of the Statute because the pulling of the cord merely caused the engineer to the train.[5] It is most important to notice that the Massachusetts Statute specifically says that the act must be one that the safety of the passengers, Statute is not designed as a safety measure but as a measure to guarantee the free and uninterrupted flow of transportation
Likewise, in the case of Bullion v. State, 1879, 7 Tex.App. 462, Texas had a statute[6] which, like the Massachusetts Statute, was designed to protect the safety of life. In that case the accused placed an obstruction on a track near Dallas: but the Texas Court reversed his conviction because it was not shown whether the track was a main track, or a switch track, nor at which speed cars were accustomed to move in passing the point of obstruction, In other words, there was no showing that the act endangered human life. As previously mentioned, our Statute, Sec. 73-Federal 1105, is not designed as a safety statute, but as a Statute to guarantee the free and uninterrupted flow of commerce. So I think the Massachusetts and Texas cases are clearly distinguishable.
The majority has not mentioned our case of Tomlin v. Williams, 214 Ark. 632, 217 S.W.2d 832, 833, in which was involved a picketing of the Williams Roofing Plant at Camden. The picket lines there were placed at a gate through which railroad cars moved. We allowed the picketing at the railroad gate "if this can be done without intruding upon appellees' property and without trespassing upon the property of otners", I have examined the briefs in the above case and I find that Sec. 73-1105, Ark.Stats, was not called to our attention, Furthermore, our opinion in Tomlin v. Wilbell iiams was delivered nearly two months feestop fore the Supreme Court of the United states decided Giboney v. Empire Storage & Ice Co_ So the case at bar is ciearly disendangers tlnguished from Tomlin v. Williams be-Our cause (a) the statute here involved was not then relied on; and (b) until Giboney v. Empire Storage & Ice Co. was decided by the Supreme Court of the United States, we still adhered to the old understanding that any kind of picketing could be done so long as there was no physical violence.
*950 To summarize:
(1) Our StatuteSec. 73-1105, Ark. Stats.makes it a misdemeanor for anyone to willfully do any act whereby an engine shall be stopped.
(2) This was and is a Statute to guarantee to the railroads the right to operate their engines.
(3) In the case at bar the strikers, by picketing the railroad tracks, have violated this Statute. And
(4) Under Giboney v. Empire Storage & Ice Co, supra, the strikers should be enjoined from interfering with the operation of the railroad engine.
Labor has its right to strike and to peacefully picket, but it must not use that right so as to interfere with the rights which the law guarantees to others. In this case the law has guaranteed to the railroad company that its engines will not be stopped. The railroad company is not a party to this labor dispute; and the pickets should not be allowed to stop the railroad engines.
For these reasons I respectfully dissent; and I am authorized to say that Mr. Justice HOLT joins in this dissent.
NOTES
[1] 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.
[2] On Page 1121 of Volume 8 of Arkansas Statutes, there is a table which shows what has happened to each Section of the said Act 71 of 1868.
[3] The fact that this Federal Statute has been upheld by the United States Supreme Court in the instance of a labor dispute leads me to believe that our State Statute, on stopping an engine, would likewise be upheld.
[4] The Massachusetts Act said: "or endangers the safety of persons conveyed in or upon" the train. G.S. c. 63, § 107.
[5] The Massachusetts Court discussed The Queen v. Hadfield (the case where the man altered the railway signals), but did not discuss the case of The Queen v. Hardy (which was the case where the man stood on the tracks and gave a signal by holding up his hands).
[6] The Texas law said that the prohibited act must be one "whereby the life of any person might be endangered * * *." Pen.Code, § 678, Vernon's Ann.P.C. art. 1335.